BOARD OF SUPERVISORS OF CHICKASAW COUNTY v. BOARD OF SUPERVISORS OF CLAY COUNTY.

NEW COUNTY. *Liability for pre-existing debts. Power of old county to bind new. Rights of Chickasaw against Clay.*

The act of the legislature creating the new county of Colfax from excised parts of several old counties provided that the new county "shall pay its portion of the debts of the counties respectively from which said county is formed, said proportions to be determined by the assessed value of the real and personal property within its limits." Under this provision the boards of supervisors of the old counties continued to be the auditing boards of the new county as to all pre-existing debts, and their action in reference thereto is as conclusive and binding upon the new county as upon the taxpayers of the original counties, and any binding judgment against them is operative upon the new county. Hence, where bonds issued by the Board of Supervisors of Chickasaw County (a part of whose territory contributed to the formation of Colfax, now Clay County), for a debt existing at the time of the creation of the latter county, were voluntarily paid off by the officers of Chickasaw County without objection on the part of Clay County, and other such bonds were paid off after being reduced to judgments against the Board of Supervisors of Chickasaw County, Clay County is bound to contribute to Chickasaw her portion of the debts thus paid by Chickasaw, not because the same were legal debts, but because they have been treated as such by the representatives of Chickasaw with the acquiescence of Clay, or have been judicially found to be legal debts in suits against the representatives of Chickasaw County.

APPEAL from the Chancery Court of Clay County.

HON. F. A. CRITZ, Chancellor.

The bill in this cause, filed by the Board of Supervisors of Chickasaw County against the Board of Supervisors of Clay County, states substantially the following facts: Pursuant to an act of the legislature, approved February 10, 1860, and to a vote of the people of Chickasaw County at an election held on the 4th of October, 1869, the board of police of that county on the 18th of October, 1869, subscribed one hundred thousand dollars to the capital stock of the Grenada, Houston and Eastern Railroad Company. In the years 1870 and 1871 the Board of Police and the Board of Supervisors (the style of the board being changed in 1871 from "Board of Police" to "Board of Supervisors") of Chickasaw County levied a railroad tax of two thousand five hundred dollars, which was collected and paid to the railroad company mentioned, as a part of the one hundred thousand dollars subscribed by that county. In pursuance of an act passed March 25, 1871, amendatory of the act of February 10, 1860, above referred to, Chickasaw County, through its board of supervisors, on the 1st of September, 1871, issued its bonds to the amount of seventy-four thousand nine hundred and ninety-two dollars, and delivered the same to the railroad company in payment of the balance of the county's subscription in aid of the road.

On the 12th of May, 1871, the legislature passed an act to create a new county, to be called Colfax. That act designated certain parts of the territory of Chickasaw and other counties to be used in the formation of the new county, and provided that the new county should pay its portion of the debts of the several counties of which it was to be formed, and that the officers of those counties should retain jurisdiction over the territory and inhabitants to be excised from each until the organization of the new county.

Colfax County was not organized as contemplated by the act of 1871, and on the 4th of April, 1872, the legislature passed another act for the creation of the same county. This act contained a provision requiring the new county to pay its portion of the debts of the counties of which it was to be formed similar to that contained

in the act of 1871. Colfax County was organized on the 17th of May, 1872, at which time Chickasaw County owed the Grenada, Houston and Eastern Railroad Company seventy-four thousand nine hundred and ninety-two dollars on its bonds issued on the 1st of September, 1871, as above stated. Afterward these bonds passed into the hands of *bond fide* owners and holders for value, and some of them have been paid off by Chickasaw County without suit, while others have been reduced to judgments against that county and are now being paid off by taxes collected from said county. The new county, organized as "Colfax," but whose name was subsequently changed to "Clay," has contributed nothing to the payment of the bonded indebtedness existing, at the time of its creation, against Chickasaw County.

The prayer of the bill is for an ascertainment of the amount due by Clay County to Chickasaw County on account of payments made by the latter on its bonds issued on the 1st of September, 1871, and outstanding at the time of the organization of the former, and that the defendant be required to levy a special tax to pay such amount as may be found due.

To the complainant's bill the defendant filed three pleas. The first plea denies that the subscription to the Grenada, Houston and Eastern Railroad Company was authorized " by a vote of the qualified electors" of Chickasaw County, for the reason that the pretended election was held at only eight out of the eleven regular election precincts of the county. The second plea denies that the subscription was authorized " by the assent of two-thirds of the qualified voters of Chickasaw County at any election held therein," and avers that the subscription was made on the 31st of December, 1869, instead of on the 18th of October, 1869, as alleged in the bill. The third plea avers that the proposition to subscribe one hundred thousand dollars to the Grenada, Houston and Eastern Railroad Company was a joint proposition for subscriptions to that and several other railroad companies, and denies that any election was ever held on a proposition to subscribe to the capital stock of the "Grenada, Houston and Eastern Railroad Company."

The court below adjudged that these pleas presented a sufficient

defense to the bill, and required the complainant to answer them, whereupon the complainant appealed to this court.

The act of May 12, 1871, " creating " Colfax County, contained the following among other provisions:

" SEC. 6. *Be it further enacted,* That nothing in this act shall be so construed as·to take from the officers of the counties from which said county is formed jurisdiction over said county and the inhabitants thereof, until the officers appointed under the provisions of this act shall have been duly commissioned and qualified and entered upon the duties of their offices.·

" SEC. 7. *Be it further enacted,* That said county of Colfax shall pay its portion of the debts of the counties, respectively, from which said county of Colfax is formed, said proportions to be determined by the assessed value of the real and personal property within its limits, and that it shall also receive its proportion of the county and school funds."

The sixth section of the act of April 4, 1872, "creating" Colfax County was as follows:

" SEC. 6. *Be it further enacted,* That said county of Colfax shall pay its' portion of the debts of the counties, respectively, from which said county of Colfax is formed, said proportions to be determined by the assessed value of the real and personal property within its limits." ·

*Martin & Bates* and *J. B. Gladney,* for the appellant.

The second plea, it will be observed, raises two separate and distinct issues :

1. That the subscription was made December 31, 1869.

2. That it was not authorized by a two-thirds vote.

And again, while this plea purports to be supported by an answer, it falls short of performing its office as such, in that it does not negative material allegations of the bill, and which under the rules of pleading, must be taken as true as against the plea. See Adams' Eq. 339 ; 2 Dan. Ch. Pl. 696 ; *Hamshire* v. *Franklin,* 16 Mass. 76 ; *Foster* v. *Foster,* 51 Vt. 216 ; *Whithorne* v. *St. Louis Mutual Life Insurance Co.,* 3 Tenn. Ch. 147.

But coming to the consideration of that part of the first and

third pleas wherein the averment is made of the submission of the question of joint stock subscription to the capital stock of the three railroads at one election, we admit as an original and independent proposition that this mode of submission has been condemned by the Supreme Court of Illinois in the case of *Supervisors of Fulton County* v. *Mississippi & Wabash R. R. Co.*, 21 Ill. 338, and 22 Ib., and in the later case of *Clark* v. *Board of Supervisors of Hancock County*, 27 Ill. 305.

But admitting all that may be deduced from these authorities, it will be found that if ever the point could have been made available in the case at bar, that time has passed, and certainly under the state of facts disclosed in this litigation the defendant is barred by estoppel. These points cannot now be raised by the pleas in question. The time has passed when even the people of Chickasaw, as taxpayers, could have made an injunction available to stay the judgments and orders of the board of police and of the board of supervisors in passing upon the validity of the election, or the order making the subscription for the county, or the order issuing the bonds and coupons, or finally, their payment to the railroad company in satisfaction of the balance due on the stock subscription. If fraud in the election, it should have been set up in apt time.

That this is uniformly the practice, and the only mode known to the law of reaching these points, seems to be settled by the weight of authority. This is exemplified in the case of *Hawkins* v. *Carroll County*, 50 Miss. 735.

*Supervisors of Fulton County* v. *Mississippi & Wabash R. R. Co.*, *supra*, was an injunction to restrain the issuance of bonds to the capital stock of the railroad company and the disposal of bonds issued.

While the court say, in the case of *Clark* v. *Board of Supervisors of Hancock County*, *supra*, "The county may be restrained from issuing bonds in pursuance of such vote, but when issued they are not necessarily void in the hands of a *bond fide* holder. But an acquiescence of the people and their subsequent ratification

by the county in levying a tax and paying interest upon them validates the subscription."

If the debt has been fastened upon the county of Chickasaw so that no such defense could be made in law, that fact determines the question as to the liability of the defendant, Clay County, because a positive statute imposes the duty of paying a *pro rata* part of the debts of Chickasaw existing at the time of the formation of the new county. Besides this, the courts were at all times as open to the people of that part of the excised territory of Chickasaw County for the redress of the wrongs and irregularities complained of in the pleas as to those of any other part of Chickasaw. And it is idle to assume for a moment that the new county in its creation, by reason thereof, acquired new defenses against this class of demands not available to the parent county. This was one of the conditions of the legislation creating the new county, and whether created in 1871 or 1872, the statute which infused life into it, in terms plain and unmistakable as can be written, gives all an intelligent knowledge of the extent and nature of the indebtedness, and it is now too late to complain of minor irregularities which were as well known then as now, if any such there were; and it would seem ungrateful now, after having obtained all the benefits to be derived from the act creating the new county, to' repudiate the obligations imposed by a spirit of equity and fairdealing, and without which, doubtless, the act would not have passed. A part of these same voters and taxpayers of Clay County helped to swell the vote for the subscription of stock to the railroad company, and it may be that without those votes there would have been no debt for Chickasaw to pay.

Their representatives in the county legislature or court helped to declare the result of the election and to make the order of subscription; they helped to ratify these proceedings by the issuance of bonds and coupons and by paying their part of the twenty-five thousand dollars of cash subscribed; and that was the time to have hunted up any irregularities in the proceedings. If it is now too late for the taxpayers of Chickasaw County to avail themselves of any such defenses, as the courts have adjudged, it is even too late

for· the taxpayers of Clay County. None of these acts were *res inter alios* as to the taxpayers of Clay County, but they participated in all of them ; and now they seek to repudiate their part of the debt which they helped by their votes to make, and which they helped by their acts to ratify and confirm and impose forever on the county of Chickasaw. When they sought a separate existence as a county, and when they desired to obtain the votes and the consent of the representatives of Chickasaw County for the passage of the act creating the new county, they accepted as a sacred and solemn obligation the condition in that act that they were to pay their part of the debts which they had helped to impose on the old county.

We submit that as a whole the first plea is not maintainable, because it is a collateral attack on the former judgments, orders, and resolutions of the Board of Supervisors of Chickasaw County in the exercise of an exclusive jurisdiction and of powers conferred by the legislature under the provisions of the act of 10th of February, 1860. See Laws 1860, p. 412.

The nature of the jurisdiction thus conferred by this act upon the board of police is such as to dignify its judgments, orders, and resolutions in all the precedent steps taken, leading to and including the order of stock subscription of one hundred thousand dollars to the Grenada, Houston and Eastern Railroad on the 18th October, 1869, with such conclusive validity as to be unimpeachable. · Certainly they are final and conclusive, unless reversed in proper time by an appellate court or vacated by a direct proceeding at the suit of interested parties before the order of stock subscription by the board of police was made or before the issuance and delivery of bonds to the railroad company and their transfer to innocent purchasers for value. Clay County being at the time in part within the territorial limits of Chickasaw, the same must apply to her with equal force. See *Carroll* v. *Board of Police*, 28 Miss. 47 ; *Arthur* v. *Adam & Speed*, 49 Miss. 409 ; *Board of Police of Attala County* v. *Grant*, 9 S. & M. 90 ; *Klein* v. *Supervisors*, 54 Miss. 254 ; *Vicksburg* v. *Lombard*, 51 Miss. 111 ; *Cutler* v. *Board of Supervisors*, 56 Miss. 115 ; *Anderson County* v. *Hous-*

*ton & G. N. R. R. Co.*, 52 Texas 228 ; *Town of Coloma* v. *Evans*, 92 U. S. 484 ; *Commissioners* v. *Black*, 99 U. S. 686 ; *Louisville & Nashville R. R. Co.* v. *State*, 8 Heisk. (Tenn.) 663.

W. S. *Bates*, of counsel for the appellant, argued the case orally. *McIntosh & Williams*, on the same side.

The pleas undertake to set up only irregularities in the submission of the proposition to the people of Chickasaw County to subscribe to the capital stock of said railroad. It has been held time out of mind almost that this is not a good defense to the bonds in the hands of *bonâ fide* purchasers where the county or municipality had the *power* or *authority* from the legislature to issue the same, and where the bonds contained recitals of the authority and vote, such as is contained in these bonds. We deem it unnecessary to cite a single authority on this point.

In the case of *Meyer* v. *City of Muscatine*, 1 Wallace (U. S.) 390, among other defenses was one that three propositions were submitted to the people at one and the same time. The court held that this defense was not available when the bonds were in the hands of third parties, affirming *Knox County* v. *Aspinwall*, 21 Howard 539, and *Mercer County* v. *Hacket*, 1 Wallace 83.

When did Clay County become a county, under the act of 1871, or under the act of 1872 ?

Colfax County was not established as a county by the act of 1871 no more than an act of the legislature could establish a corporation by passing its charter and giving a name. There must be an organization under that charter. A county is a *quasi* corporation, and, like a corporation, can have no existence without its *charter* and an organization under that charter.

Even if Clay County was established by the act of March, 1871, before the bonds were issued, September 1, 1871, the pleas must be held bad in law, for the bill shows this indebtedness of Chickasaw County was originally incurred by *subscription* to the capital stock of the Grenada, Houston and Eastern Railroad Company in October, 1869, and that one payment was made on this subscription in 1870 by taxes levied and collected from the taxpayers of the entire county of Chickasaw prior to the passage of the act of 1871,

and one payment made by the entire county after the act of 1871. The acquiescence by payment of the tax is an estoppel upon Clay County to now deny that the subscription was made. Clay County received the territory and inhabitants of Chickasaw County with all their *faults.*

*F. S. White, L. F. Bradshaw,* and *Barry & Beckett,* for the appellee.

1. The third plea as well as the first raises the point whether any proposition to subscribe to the Grenada, Houston and Eastern Railroad Company was ever submitted to the qualified electors of Chickasaw County.

It was a proposition to subscribe to three railroads, " *to be voted on as a whole, as one joint proposition.*" There was no statute for this. It cannot be affirmed that a vote for the whole of a joint proposition is a vote for any particular part of it. It is the entity which is voted for. In any other shape the vote could have been different, which shows that the vote and the entity are inseparably connected. Hence, we say, no election was ever held on a proposition to subscribe to *the Grenada, Houston and Eastern Railroad,* and no other proposition was authorized by the act of February 10, 1860. A county has no inherent power to subscribe to a railroad, and when the power is conferred and the terms prescribed by the legislature, the power only exists within the terms. If this plea is good it ends the case, for it is generally conceded that the doctrine of estoppel only applies to irregular elections and not to cases where there has been no election. 3d ed. Daniell Neg. Ins., §§ 1551 and 1552; *Northern Nat. Bank* v. *Porter,* 5 Fed. Rep. 568.

2. The first plea presents three points in relation to the vote:

(1st.) That " the election was only held at eight out of eleven of the regular election precincts of the county, and those at points most contiguous to the proposed lines of railway." This was, to say the least, not a fair or complete test of the sense of the voters, and was violative of the statute which provided that the election should be held " at the regular election precincts of the county." Acts 1860, p. 412, § 1.

(2d.) That the election was carried by the votes of negroes and mulattoes, who were permitted to register and vote. The only legal voters under the laws of Mississippi, on October 4, 1869, were " free white male citizens over the age of twenty-one years." Code 1857, p. 93, art. 16.

The fourteenth and fifteenth amendments were not adopted by Mississippi till January 15, 1870. Acts 1870, p. 631–634.

The fifteenth amendment was not ratified by three-fourths of the States till after January 1, 1870, and was not promulgated till March 30, 1870. U. S. Rev. Stat. (1878) p. 32, note at bottom; Code 1880, p. 18.

The negroes and mulattoes were given the special privilege of voting on the adoption or rejection of the constitution of 1869 by the convention of 1868 and the reconstruction acts, but they had no general right to vote until its adoption on December 1, 1869.

(3d.) That three propositions to subscribe to three different rail-roads were united in one and submitted as a joint proposition, and the form of the ticket was prescribed so that each voter would be compelled to vote for or against all, and could not vote for one or the other separately.

This is condemned in the strongest terms as such a coercion of the voters and such a fraud on the elective franchise as to invalidate any subscription under such a pretended election. *Ex parte Selma & Gulf R. R. Co.*, 46 Ala. 230, 246–248, 264–267; *People v. Tazewell Co.*, 22 Ill. 156; *Fulton v. Wabash, etc.*, 21 Ill. 338, 372, 373; *Garragus v. Polk Co.*, 39 Ind. 66; *Marsh v. Fulton Co.*, 10 Wall 676; *Lewis v. Comm'rs*, 12 Kans. 213–222; *I. B. & W. R. R. Co. v. Fountain Co.*, 39 Ind. 215; *Spurck v. L. & W. R. R. Co.*, 14 Neb. 293; *Gulf R. R. Co. v. Marshall Co.*, 12 Kans. 230; *Bamberg v. Comm'rs*, 41 Ind. 503, 504; *Jones v. Hurlbut*, 13 Neb. 132–136; *Monadnock v. Peterborough*, 49 N. H. 281; *McMillen v. Boyles*, 3 Iowa 311, 317–321; 3d ed. Daniell Neg. Ins., § 1535 and n.; *State v. Saline County*, 45 Mo. 242; *Mercer Co. v. Pittsburg, etc.*, 27 Penn. St. 389.

There was no authority whatever for a county subscription to the New Orleans, Jackson and Great Northern Railroad, and a

vote on that could confer no right.   *Allen* v. *Louisiana*, 103 U. S. Rep. 80–86.

The proposal as to the Memphis and Selma was in the alternative, one hundred thousand dollars if it should be located by way of Houston, or thirty-five thousand dollars if it should be located by way of Okolona.   This was indefinite and rendered the election illegal.   *Mercer Co.* v. *Pittsburg, etc.*, 27 Penn. St. 389; *State* v. *Saline*, 45 Mo. 242; 3d ed. Daniell Neg. Ins., § 1535 and n.

Here there is a proposition to subscribe to a railroad for which there was authority, the Grenada, Houston and Eastern Railroad Company, a proposition to subscribe to another railroad, the Memphis and Selma, but so indefinite as to be illegal, and a proposition to subscribe to still a third railroad for which there was no authority.

3. Clay County was created May 12, 1871, and the bonds were not issued until September 1, 1871.   The act of April 4, 1872, may be left out of the argument, for it was an act purporting to create a county that had already been created, and hence may be regarded as a mere re-affirmation of the prior act, for it is settled law that while the legislature has the power to adjust the equities and apportion the debts when creating a new county, yet it must be done *in the act creating the county.*   *Bowdoinham* v. *Richmond*, 6 Greenl. 112; *Town* v. *City*, 12 Wis. 104; *Montpelier* v. *Montpelier*, 29 Vt. 20; *Eagle* v. *Beard*, 33 Ark. 505; *County Comm'rs* v. *County Comm'rs*, 1 Wy. Ter. 141; *Chickasaw County* v. *Sumner County*, 58 Miss. 619; *Windham* v. *Portland*, 4 Mass. 384.

It is claimed, however, that Clay County is liable under the sixth section of the act of May 12, 1871, which provides that the officers of the old county should retain jurisdiction over the new county until it was organized, and that it was not organized until *May* 17, 1872; but the answer to this is that even if it be admitted that this gave the old counties power to create new debts, there is no provision that Clay County shall be liable for them after they were created.   At most it could only affect the fraction taken from Chickasaw, for the officers of that county are given no

jurisdiction over the portions taken from Monroe, Lowndes, and Oktibbeha Counties.

To justify imposing any additional liability there must be express power reserved in the act itself. *Granby* v. *Thurston*, 23 Conn. 417, 419.

The act creating a new county fixes its liability, notwithstanding it is to be organized or officers appointed afterward. *People* v. *Wren*, 4 Scam. (Ill.) 269 ; 34 N. H. 266 ; 1 Dill. Mun. Corp., § 23 (second edition) ; *Vicksburg* v. *Lombard*, 51 Miss. 117–121.

The seventh section of the act of May 12, 1871, provides that Clay County shall pay its portion of the *debts* of Chickasaw. The word *debt* has a certain defined signification, and does not include *contingent liabilities* or damages. So held in a case where the old county was claimed to be liable to a party for damages for injury by a defective bridge, although the bridge and injury was in the territory cut off into the new county. *Askew* v. *Hale Co.*, 54 Ala. 643, 644 ; 106 Mass. 542; 2 Denio 73; 6 Hill (N. Y.) 252; 13 Metc. (Mass.) 334.

Bonds issued after a new county is created are not binding on the new county unless issued for a debt that was valid and binding on the new county. *Commissioners* v. *Bunker*, 16 Kan. 500, 503, 504 ; *Chandler* v. *Reynolds*, 19 Ib. 249 ; *Commissioners* v. *Commissioners*, 26 Ib. 200 ; *Eagle* v. *Beard*, 33 Ark. 497, 507, 508.

*R. C. Beckett*, of counsel for the appellee, argued the case orally.

COOPER, J., delivered the opinion of the court.

The pleas upon various grounds challenge the validity of the bonds executed by Chickasaw County and of the subscription under which they were issued. The conclusion sought to be reached is that if there was no authority of law for the execution of the bonds and none for the subscription on which they were based, then neither the subscription nor the bonds created a debt against Chickasaw County, and, therefore, that Clay County cannot be called upon by Chickasaw to reimburse it for any money paid by it in the discharge of the supposed obligations under which it rested.

The theory of the defendant is that from the date of its creation

and its organization under its own officers, those officers became and were its sole representatives, both as to the future and the past; that from that date the officers of Chickasaw County became strangers to the new county and all its territory and inhabitants, and were equally without authority to bind it for future or to represent it in past transactions.

Standing upon this premise, the defendant asserts two propositions, first, that by the act creating Clay County it was charged only with its proportionate share of the debts legally owing by the counties from which it was created; second, that the subscription to the Grenada, Houston, and Eastern Railroad by Chickasaw County was without authority of law and created no debt against Chickasaw County.

Admitting the correctness of both these propositions, they nevertheless constitute no sufficient defense, unless the premise assumed by the defendant is also true, and we are satisfied it is not.

Manifestly it was not the purpose of the legislature to impose upon the new county the payment of anything other than its fair proportion of the debts with which the old counties were then burdened; it is equally clear that it was intended for it to pay a due proportion of such debts as were then outstanding against them.

At the time of the passage of the act creating Colfax County the subscription to the railroad company was recognized both by the officials of Chickasaw County and by its inhabitants as valid and obligatory, as is shown by the fact that a tax was levied by the county authorities and paid by the people for two successive years in payment of the first two annual installments of the sum subscribed. It would be a strained construction of the act by which the conclusion could be reached that the legislature did not intend to include or intended to exclude this debt, which was recognized by those most interested in its existence, as one of which Colfax County should pay its proportionate part.

The act creating the new county contained no provision designating the manner by which the debts of the various counties from which Colfax was created should be established, audited, or adjusted.

Why was this not done? The obvious reply is that there was already provided by the general law machinery for the adjustment of all claims against the counties.

Primarily such claims were to be presented to the boards of supervisors for allowance, and unless the claim was presented to and rejected by the board the creditor could not resort to the courts for redress; if the claim presented to the board was rejected by it, then the creditor might appeal from such decision to the courts or proceed by original action at law.

Creditors of the old counties were not by the act creating Colfax County given a remedy against that county; they continued, as before, creditors of the old counties and their sole right was to recover from them.

The effect of the allowance of a claim by the board of supervisors of a county is not so broad as that which results from the rendition of a judgment in a suit against the county, for in the former case the board of supervisors, acting under and in pursuance of statutes, cannot allow any claim not authorized by law, and if such claim is allowed the taxpayer may by proper proceedings attack and vacate the order and procure a cancellation of the warrant issued by the board, or may resist the collection of taxes levied for its payment; but if no steps are taken and payment of the warrant is made, the individual taxpayer is without relief. On the other hand, where a suit is brought by the creditor against the board and a judgment recovered, such judgment is final and conclusive against the board, and in the absence of fraud and collusion is conclusive against the taxpayers, upon the ground that they are real though not nominal defendants therein. *Clarke* v. *Wolf*, 29 Iowa 197; Freeman on Judgments, § 178.

The citizens of Chickasaw County were then bound by the judgments in favor of the bondholders against the board of supervisors of that county, because they were the real parties in interest therein and were represented by the board, and for the further reason that if the judgment had been in favor of the defendants, it would have operated to discharge them from liability on the bonds.

It is evident that Colfax County would also have been discharged from liability by a judgment in favor of the Board of Supervisors of Chickasaw County, and, therefore, it may be said that it was a real party in interest, and if this release would have arisen, not collaterally and incidentally, but directly and because of the fact that the defendants stood in a representative capacity to it, it follows that it is bound by the judgments against such representatives.    Was it also a party by representation ?

We must assume that at the time of the passage of the act creating Colfax County those counties from which its territory was taken occupied the usual condition of other counties, with outstanding contracts for the support of the poor, the teaching of the public schools, the building and repairing of bridges, and in relation also to the many other subjects of internal police. Over all such contracts surely the boards of supervisors were invested with jurisdiction and might audit and allow the claims of persons who had rendered the services contracted for.    In the exercise of such jurisdiction, the fact of the indebtedness of the county, as constituted at the time when the contracts were made and performed, was necessarily determined, and there is nothing in the act creating the new county indicating a legislative intent that such determination should be less binding upon the excised territory or upon the county into which it had been incorporated than upon the territory which remained in the old counties.    Colfax County took the excised territory *cum onere,* and whatever debts bound Chickasaw County were in due proportion binding upon it.

In the absence of an express legislative declaration, we cannot assume that it was intended that in the apportionment of the debts Chickasaw County should be required to establish anew the validity of those debts which had been audited and allowed by its constituted authorities and paid, or for which judgments had been rendered against it.    Ample protection against fictitious or fraudulent claims was offered to the new county by the fact that Chickasaw County could only demand from it the payment of a proportionate part of those debts which had been legally fixed against itself, either by the action of its board of supervisors or

by the judgment of a court of competent jurisdiction. We are satisfied that under the act creating Colfax County the boards of supervisors of the old counties remained the auditing boards of the new county as to all pre-existing debts, and that their action in reference thereto was binding and conclusive upon Clay County to the same extent that it bound and concluded the taxpayers of the original counties.

Nor are we able to distinguish between the case of an allowance of a claim by the board of supervisors and one in which the liability was fixed on the board *in invitum* by the judgment of a court of law. If the board in the exercise of its judicial or ministerial functions could bind Colfax County because it stood in that act as the legal representative of that county, for the same reason a judgment in an action *inter partes* was obligatory upon it.

We are, therefore, of the opinion that both in the suits at law on the bonds and in the payment of those on which no suits were brought the county officials of Chickasaw County were the representatives of all that territory which composed the county when the debts, real or assumed, were contracted; that the excised territory was bound because Chickasaw was, and that Colfax County was bound because the territory it acquired was bound.

From this it follows that it is too late for Clay County (formerly Colfax) to interpose the objections set up in its pleas. It should have acted to restrain the payment by Chickasaw County of those of the bonds upon which no judgments had been rendered. Having failed so to do, it is now bound for its proportion of the debts paid by Chickasaw County, not because such debts were in fact legal debts, but because they have been treated as such by the authorities of Chickasaw County with the acquiescence of Clay County, or have been judicially found to be legal debts in a suit brought against the Board of Supervisors of Chickasaw County. The time has passed when the inquiry invited by the pleas might have been made.

*The decree is reversed, the pleas disallowed, and the defendant given leave to answer within thirty days after the mandate shall have been filed in the court below.*